# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SHERRY RUSSELL, | ) |
|     Plaintiff, | ) ) ) |
| vs. | )    Case No. CIV-15-0032-HE ) |
| CAROLYN W. COLVIN, acting Commissioner Social Security Administration, | ) ) ) ) |
|     Defendant. | ) ) |

## REPORT AND RECOMMENDATION

Sherry Russell (Plaintiff) filed this action for judicial review of the Defendant Acting Commissioner of Social Security's (Commissioner) final decision denying Plaintiff's application for disability insurance benefits. *See* 42 U.S.C. § 405(g). United States District Judge Joe Heaton referred the matter to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b)(1)(B), (b)(3) and Fed. R. Civ. P. 72(b). Doc. 4.

After a careful review of the administrative record (AR), the parties' briefs,[1] and the relevant authority, the undersigned recommends the entry of judgment affirming the Commissioner's final decision. *See* 42 U.S.C. § 405(g).

---

[1] Citations to the briefs reflect this Court's CM/ECF designation and pagination. Unless otherwise indicated, quotations in this report are reproduced verbatim.

I.      **Disability within the meaning of the Social Security Act.**

Plaintiff applied for disability benefits on September 5, 2011 and, by amendment, alleges disability as of August 1, 2007, at the age of fifty-four. AR 8, 21, 133. Plaintiff's earnings records establish that she had enough quarters of coverage to remain insured for benefits only through December 31, 2007. *Id.* at 8, 21,149.

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "This twelve-month duration requirement applies to the claimant's inability to engage in any substantial gainful activity, and not just his underlying impairment." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Barnhart v. Walton*, 535 U.S. 212, 218-19 (2002)).

II.     **The Commissioner's final decision.**

Adhering to the regulatory process adjudicators must follow to determine if a claimant is disabled within the meaning of the Social Security Act, the ALJ found that through December 31, 2007, the date Plaintiff last met the insured status requirements of the Social Security Act, she: (1) was severely impaired

by rheumatoid arthritis, obesity, and fibromyalgia; (2) had the residual functional capacity (RFC) to perform work at the medium exertional level, with limitations;[2] (3) could perform her past relevant work as a payroll change clerk; and (4) was not disabled. AR 8-14; *see* 20 C.F.R. § 404.1520(b)-(f); *see also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the sequential process).

The Social Security Administration's (SSA) Appeals Council found no reason to review that decision, and the ALJ's decision became the Commissioner's final decision. AR 1-3.

## III. Analysis of the Commissioner's final decision.

### A. Review standards.

The court reviews the Commissioner's final "decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied." *Mays v. Colvin*, 739 F.3d 569, 571 (10th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. A decision is not based on substantial evidence "if it is overwhelmed by other evidence in the record." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009)

---

[2] Residual functional capacity "is the most [a claimant] can still do despite [a claimant's] limitations." 20 C.F.R. § 404.1545(a)(1).

(internal quotation marks omitted). The court will "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Newbold v. Colvin*, 718 F.3d 1257, 1262 (10th Cir. 2013) (internal quotation marks omitted).

### B. Plaintiff must establish disability on or before December 31, 2007.

"An important requirement in this case is that [Plaintiff] had to show [s]he was disabled on or before h[er date last insured – December 31, 2007]." *Vititoe v. Colvin*, 549 F. App'x 723, 728 (10th Cir. 2013) (claimant had to establish that on or before his date last insured he could not engage in any substantial gainful activity for a continuous twelve-month period); *see Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1348-49 (10th Cir. 1990) (holding "the relevant analysis is whether the claimant was actually *disabled* prior to the expiration of her insured status").

### C. Plaintiff's claims of error.

Plaintiff summarily maintains (1) "there is no substantial evidence for [the ALJ's] finding of a medium RFC with too much vocational adjustment to her past work or other work in the economy" and (2) "the ALJ rejected the treating physician evidence and rejected the state agency (DDS) opinions and acted as his own doctor while never discussing the weight their opinions or the

lay opinions should receive." Doc. 12, at 3.

This report, to the extent possible, attempts to address Plaintiff's arguments in the order briefed.

> **1. Whether the ALJ committed reversible error at step four in finding that Plaintiff, through the date last insured for disability benefits, was capable of performing her past relevant work as a payroll change clerk.**

The ALJ ended the sequential analysis at step four, finding that through the date when last insured for benefits, Plaintiff could perform her past relevant work. AR 13. He relied on a vocational expert's (VE) testimony describing Plaintiff's past relevant work as that of a payroll change clerk, sedentary and semiskilled, and coded in the Dictionary of Occupational Titles by the identifier 215.382-014. *Id.* He then compared Plaintiff's RFC for a range of medium work with the demands of this work and determined Plaintiff could perform the work as it was actually and generally performed. *Id.*[3]

Plaintiff faults this step four determination on two fronts, the first implicating the ALJ's assessment of her RFC and the second on the theory that the ALJ was required, but failed, to consider vocational adjustment at the fourth

---

[3] At step four, Plaintiff "bears the burden of proving his inability to return to his particular former job and to his former occupation as that occupation is generally performed throughout the national economy." *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

step of the analysis. Doc. 12, at 3-10.

### a. Pertinent RFC claims.[4]

Plaintiff questions why the ALJ would find she could perform work at the medium exertional level while "return[ing] her" to past relevant work performed at the sedentary level. *Id.* at 4. Though she speculates about the ALJ's motivations, she fails to establish error. *Id.* "If someone can do medium work, [the SSA] determine[s] that . . . she can also do sedentary and light work." 20 C.F.R. § 404.1567(c). Similarly, Plaintiff points to SSR 83-10, 1983 WL 31251, at *6 (1983), and argues that because the ruling states that "[t]he considerable lifting required for a full range of medium work <u>usually requires **frequent bending-stooping**</u>," "[t]here is therefore no substantial evidence for the ALJ's RFC with limited postural's at occasional, not frequent as the ruling requires." Doc. 12, at 4. The issue, however, is not whether Plaintiff can still perform some past relevant medium-exertional work, but, rather, whether she can return to her past relevant work as a payroll change clerk – work that is performed at the sedentary level. AR 13.[5]

---

[4] This report addresses Plaintiff's remaining challenges to the evidentiary and legal sufficiency of the ALJ's RFC assessment below. *See infra* Part III.C.2.

[5] Notably, Plaintiff reported she did no stooping in her work as a payroll change clerk. AR 154.

### b. Vocational adjustment.

Plaintiff maintains that "[b]ecause the ALJ failed to apply the correct legal principles, his finding of not disabled is not supported by substantial evidence." Doc. 12, at 10. Specifically, she argues it is the Commissioner's burden at step four "to demonstrate that [Plaintiff] had skills which would permit her to return to her past work without vocational adjustment greater than 'little, if any.'" *Id.* at 9. "Because of her time out of the work-force," she claims the ALJ erred by failing to ask the vocational expert a hypothetical calculated to determine "whether or not the skills [Plaintiff] had acquired in her past work would permit her to return to her past work with little or no vocational training or job orientation." *Id.* And, she claims "the ALJ failed to make findings specifically targeted at the level of vocational adjustment needed for [Plaintiff] to reenter her PRW as required by Social Security Ruling 82-41." *Id.* at 9-10.

Plaintiff does not cite to a single case authority, SSA regulation, or SSA ruling to support her contentions regarding a decision reached, as here, at step four of the sequential analysis. *Id.* at 5-10. Nor can she. At step four, "[i]f [the SSA] find[s the claimant] ha[s] the [RFC] to do [the claimant's] past relevant work, [the SSA] will determine that [the claimant] can still do [the claimant's] past work and [is] not disabled." 20 C.F.R. § 404.1560(b)(3). "[The SSA] will *not*

consider [the claimant's] vocational factors of age, education, and work experience . . . ." *Id.* (emphasis added). Plaintiff relies only on authorities that govern at step five where a claimant's age does become relevant.[6] Doc. 12, at 5-10. This leaves her claim of error supported only by the legally inapt testimony of the VE.

On questioning by Plaintiff's counsel, the VE opined that Plaintiff would have to make a mild vocational adjustment "not just to access the past work but to access other work where transferable skills would be applicable as well." AR 56. But vocational adjustment applies only at step five where a claimant's age impacts her ability to "make an adjustment to *other* work . . . ." *See* 20 C.F.R. § 404.1568(d)(4) (emphasis added). At step five,

> [i]f [the claimant is] of advanced age and [the claimant] ha[s] a severe impairment(s) that limits [the claimant] to no more than sedentary work, [the SSA] will find that [the claimant] ha[s] skills that are transferable to skilled or semiskilled sedentary work only if the sedentary work is so similar to [the claimant's] previous work that [the claimant] would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.

*Id.* At step four, to accommodate the erosion over time of a claimant's

---

[6] "If [the SSA] find[s] that a [a claimant's RFC] does not enable [the claimant] to do any of [the claimant's] past relevant work . . . [the SSA] will use the same [RFC] assessment when [the SSA] decide[s] if [the claimant] can adjust to any other work." 20 C.F.R. § 404.1560(c). The SSA looks at the claimant's "ability to adjust to other work by considering [the claimant's RFC] and the vocational factors of age, education, and work experience . . . ." *Id.*

8

capability of performing previous work, the SSA defines past relevant work as "work that [the claimant] ha[s] done within the past 15 years" and "consider[s] that [the claimant's] work experience applies when it was done within the last 15 years . . . ." *Id.* §§ 404.1560(b)(1), 404.1565(a). The agency "do[es] not usually consider that work [the claimant] did 15 years or more before the time [the SSA is] deciding whether [the claimant is] disabled (or when the disability insured status requirement was last met, if earlier) applies." *Id.* § 404.1565(a). It acknowledges that "[a] gradual change occurs in most jobs so that after 15 years it is no longer realistic to expect that skills and abilities acquired in a job done then continue to apply." *Id.* "The 15-year guide is intended to insure that remote work experience is not currently applied." *Id.*

Nonetheless, Plaintiff argues "it was error by the ALJ to accept part of the VE testimony, but reject other parts which defeated [past relevant work]." Doc. 12, at 7. She claims "the ALJ was duty-bound to address the adjustment issue in his opinion, even though his RFC was (wrongly) for medium work, since he returned her to past work which the VE testified required too much adjustment to re-access." *Id.* at 8. According to Plaintiff, "[t]here is no substantial evidence for the ALJ not to address the adjustment issue." *Id.*

As authority for the singular proposition that a VE's testimony trumps SSA regulations, Plaintiff (belatedly, in her reply brief) relies on the decision in

9

*Campbell v. Bowen*, 822 F.2d 1518, 1523 n.6 (10th Cir. 1987), where the court concluded that an ALJ "may not ask a vocational expert a hypothetical question based on substantial evidence and then ignore unfavorable answers." *See* Doc. 19, at 3-4. But Plaintiff's counsel's questioning was not grounded on "evidence" that could properly inform the ALJ's step-four determination. The questions by Plaintiff's counsel to the VE about "vocational adjustment just to re-access the old work," AR 55, assumed a legal fiction. "Any (essentially tautological) opinions premised on such an assumption clearly would not bind the ALJ." *Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993).

Plaintiff fails to establish reversible error.

### 2. Whether the ALJ committed reversible error in assessing Plaintiff's RFC.

In formulating Plaintiff's RFC, the ALJ considered Plaintiff's administrative hearing testimony:

> The claimant testified that she is disabled due to fibromyalgia and rheumatoid arthritis; and obesity, with a weight of 185 pounds. The claimant described arthritic signs and symptoms including hand cramps; joint stiffness; pain in the low back, legs, hands, thumbs, wrists, elbows, and feet; lower extremity swelling; right thumb swelling; and multiple trigger points. The claimant stated that her pain is of sufficient severity to affect her ability to sleep. The claimant stated that she attempts to alleviate her pain with a heating pad, warm water, and elevating her feet. The claimant estimated that she is limited to lifting eight pounds; with additional significant limitations on gripping, and gross and fine finger dexterity.

10

AR 12. Then, "[a]fter careful consideration of the entire record," the ALJ "f[ound] that, through the date last insured, the claimant had the [RFC] to lift and carry 50 pounds occasionally and 25 pounds frequently." *Id*. at 11. He further determined Plaintiff could sit, stand, and walk for about six hours in an eight-hour workday. *Id.* He limited her, however, to work where she would be required to only occasionally climb, balance, stoop, kneel, crouch, and crawl. *Id.*

In making this assessment, the ALJ reviewed the records of R. Eugene Arthur, M.D., who first saw Plaintiff on October 2, 2006. *Id*. at 12-13, 209-74. The ALJ noted Plaintiff's medical history of "diffuse musculoskeletal symptomatology, a sedimentation rate of 122, a long history of neck and low back pain, and morning stiffness." *Id*. at 12; *see id.* at 273. He also noted Dr. Arthur's initial physical examination findings: "Heberden's and Bouchard's nodes with 1+ swelling of the proximal interphalangeal joints; thickness of the right wrist; and swelling in the second, third, and fourth metatarsophalangeal joints bilaterally; tenderness posteriorly in the cervical spine and pain with motion and 10% loss of rotation and lateral bending; trapezius, rhomboid, and scapular tenderness bilaterally; midline lumbar tenderness and pain with motion; and gluteal tenderness bilaterally (Exhibit 1F)." *Id*. at 12-13; *see id*. at 270-72, 273-74.

By December 18, 2006, Plaintiff's neck and low back pain had improved

with a dosepak, but Plaintiff did not respond to the prednisone Dr. Arthur had prescribed for possible polymyalgia rheumatica. *Id.* at 13, 260, 274. So, Dr. Arthur started Plaintiff on a second line drug, methotrexate, for her "potentially aggressive" rheumatoid disease. *Id.* at 260. Plaintiff returned to Dr. Arthur on June 6, 2007, reporting improvement in her hands and wrists with methotrexate and only mild soreness with squeezing and grasping. *Id.* at 13, 254. Her low back pain was better. *Id.* "Subsequent to her alleged onset date, on September 11, 2007, it was noted that the claimant had done well with methotrexate 15 mg weekly, with less soreness in her joints and only an occasional flare of soreness in her hands (Exhibit 1F)." *Id.* at 13; *see also id.* at 249.

On December 11, 2007, Plaintiff reported "a bad November" with more swelling, soreness, and stiffness in her hands but that "her symptoms had tapered a bit." *Id.* at 242, 13. She had occasional metatarsophalangeal pain and intermittent lumbar pain aggravated by standing, not walking. *Id.* She had right heel tenderness; Dr. Arthur provided heel cups. *Id.* at 242. Dr. Arthur noted that Plaintiff's rheumatoid disease seemed more active with swelling in her hands and wrists but did not cause all of her symptomatology. *Id.* Due to Plaintiff's elevated liver function tests, Dr. Arthur did not want to increase her methotrexate dosage and concluded that "the only reasonable thing here is to consider TNF drugs." *Id.* He planned to apply for all three TNF drugs and to

12

then allow Plaintiff to elect how she wished to proceed. *Id.* Dr. Arthur also noted that Plaintiff's joints may hurt with activity but that a characteristic of her fibromyalgia is pain with activity. *Id.* He "told her that she needed to exercise despite the pain and take a pain pill for it." *Id.* at 243.

Dr. Arthur noted that Plaintiff had improved on February 12, 2008, her first office visit after the expiration of her insured status. *Id.* at 239. The application for TNF drugs had been approved and Plaintiff received her first Remicade infusion. *Id.* Plaintiff reported on March 25, 2008, that she felt bad after her previous Remicade infusion but believed it was weather-related. *Id.* at 233. By now, "she [wa]s only having mild soreness in her hands squeezing and grasping." *Id.* Dr. Arthur again noted improvement on May 20, 2008. *Id.* at 229. On July 25, 2008, Plaintiff said "she is as least 50% better with Remicade." *Id.* at 225. On September 8, 2008, Plaintiff's condition had regressed somewhat. *Id.* at 221. Dr. Arthur noted that she had been doing better with Remicade but had then had pneumonia and was off her methotrexate. *Id.* On November 4, 2008, before Dr. Arthur's dictation abruptly ended, he noted that Remicade had helped Plaintiff for six weeks but for the past two weeks she had experienced "trouble with her right 4th and 5th PIPs and thumb MCPs"; was bothered by her left wrist; had minimal cervical pain; had episodic lumbar pain; and "some myalgias with all-over aching." *Id.* at 216.

13

Plaintiff received an Orencia infusion on December 30, 2008. *Id.* at 209.

The ALJ also reviewed Lisa M. Farhood, M.D.'s treatment records for the time relevant to Plaintiff's alleged disability. *Id.* at 13.[7] On May 14, 2007, Plaintiff complained she was not feeling well. *Id.* at 354. Nonetheless, her joint pain was better and she was having fewer headaches. *Id.* "Her allergies [were] still bad, though." *Id.* On physical examination, Dr. Farhood reported normal, including musculoskeletal and extremities findings. *Id.* at 355. On November 12, 2007, Plaintiff – consistent with her report of a "bad November" to Dr. Arthur, *id.* at 242 – advised Dr. Farhood that "her rheumatoid arthritis has been acting up." *Id.* at 351. Once again, the findings on musculoskeletal and extremities examination were normal. *Id.* at 353. On May 14, 2008, Plaintiff relayed that she had been doing well but continued to have problems with her rheumatoid arthritis. *Id.* at 307. Dr. Farhood reported normal physical findings. *Id.* at 310. On August 20, 2008, Plaintiff was ill and feverish with possible bronchitis. *Id.* at 304. Dr. Farhood again noted normal physical findings. *Id.* at 305. Plaintiff advised on November 13, 2008, that Dr. Arthur was considering stopping her Remicade treatment due to elevated liver function tests. *Id.* at 297. Physical findings were normal. *Id.* at 298. Finally, the ALJ

---

[7] "To establish a period of disability, you must have disability insured status in the quarter in which you become disabled or in a later quarter in which you are disabled." 20 C.F.R. § 404.131(a).

noted that Dr. Farhood indicated on a February 12, 2012 Treating Physician Mental Functional Assessment Questionnaire that she had not treated Plaintiff for a mental condition. *Id.* at 13; *see id.* at 276. There is no record of any physical functional assessment by Dr. Farhood.

The ALJ further determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible for the reasons explained in this decision." *Id.* at 12. He then explained his rationale. *Id.* Plaintiff claims no error in that credibility determination. *See* Doc. 12.

Instead, Plaintiff challenges the ALJ's assessment of her RFC on the following grounds.

### a. Age and body habitus.

Plaintiff questions how she, a fifty-five year old, 4'11" woman could have performed medium work through her date last insured. *Id.* at 3, 10. But "in assessing RFC, the adjudicator must consider *only* limitations or restrictions attributable to medically determinable impairments. **It is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) . . . due to factors such as age or height** . . . ." SSR 96-8p, 1996 WL 374184, at *2 (Jul. 2, 1996) (italicized emphasis added). This is because

15

> [t]he definition of disability in the Act requires that an individual's inability to work must be due to a medically determinable physical or mental impairment(s). The assessment of RFC must therefore be concerned with the impact of a disease process or injury on the individual. In determining a person's maximum RFC for sustained activity, factors of age or body habitus must not be allowed to influence the assessment.

*Id.* at *8 n.5.

### b.  Evidentiary support.

Plaintiff claims "there is no evidence, medical or otherwise that [she] can perform medium work." Doc. 12, at 4. As support, she relies both on her own opinion that "[t]his is not a woman who can do medium work" and, largely, on her subjective reports to Dr. Arthur. *Id.* at 11. She maintains that in assessing her RFC, the ALJ "rejected every doctor in the process of playing doctor." *Id.* Plaintiff fails, however, to point to any "rejected" indication from any doctor that she had *consistent* limitations which precluded the performance of a range of medium work[8] – or the sedentary work of a payroll change clerk[9] – through her

---

[8]  As the undersigned's explication of the medical evidence for the relevant period reflects, the effects of Plaintiff's impairments varied greatly with treatment.

[9]  Under 20 C.F.R. § 404.1567(a),

> [s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often
>
> (continued...)

date last insured, and the ALJ discounted her subjective complaints, a finding she does not contest.[10]

### c. Treating physician opinions.

Plaintiff also contends that "[t]he primary and overarching requirement is that an ALJ must consider every medical opinion in the record." *Id*. at 12. She maintains "[t]he ALJ rejected the agency doctors [b]ut, that is the only thing he said about any doctor's opinion in the file. He never discusses the treating physician's opinions for weight and there are no consultative doctors." *Id*. at 10. Plaintiff asks "what of Dr. Arthur and Dr. Farhood's opinions?" and faults the ALJ for "never mention[ing] the weight these treating physicians should receive in his paltry decision." *Id*. at 11.

Plaintiff is, without doubt, correct that "[i]t is the ALJ's duty to give consideration to all the medical opinions in the record [and to] also discuss the weight he assigns to such opinions." *Keyes-Zachary v. Astrue*, 695 F.3d 1156,

---

[9](...continued)
necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

[10] Plaintiff's subjective reports to Drs. Arthur and Farhood are just that – they are not medical opinions. *See* Doc. 12, at 11; *see also* AR 233. And, regarding Plaintiff's citation to AR 209, Doc. 12, at 11, that clinic note does refer to Orencia but, contrary to Plaintiff's claim, contains no statement by Dr. Arthur. *See* AR 209.

1161 (10th Cir. 2012) (citing 20 C.F.R. § 404.1527(c), (e)(2)(ii)). Plaintiff fails, however, to direct the court to a medical opinion that the ALJ failed to properly consider. Instead, in her briefing, Doc. 12, at 10-12, Plaintiff points to Dr. Arthur's December 11, 2007 notations that "[i]t seems that [Plaintiff's rheumatoid] disease is definitely more active now"; there "is [MTP] synovitis"; "[t]here is more swelling in her hands and wrists"; pain with motion; and low back pain. AR 242. But the ALJ credited Dr. Arthur's objective findings to support his RFC assessment, *id.* at 12-13, and even generously construing the progress report notations as opinions, "[n]one of these observations . . . offers an *assessment* of the effect of [Plaintiff's rheumatoid disease] on her ability to work." *Keyes-Zachary,* 695 F.3d at 1164 (emphasis added). "The ALJ's failure to assign a specific weight to [Drs. Arthur and Farhood's] observations . . . did not represent harmful error." *Id.*

### d. The ALJ's assessment of the function report completed by Plaintiff's husband.

The ALJ addressed the Function Report-Adult-Third Party that Plaintiff's husband, Terry Lynn Russell, completed. AR 12, 171-78. Plaintiff submits the ALJ erred by failing "to identify the weight his statement should receive." Doc. 12, at 12. She claims "[t]he ALJ should have correctly applied the factors of SSR 06-03p." *Id.*

SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006), explains how evidence from non-medical sources such as a spouse should be handled:

> In considering evidence from "non-medical sources" who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.

*Id.* at *6. But even as to *opinions* from non-medical sources who have seen the claimant in a *professional* capacity "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision . . . ." *Id.* The ALJ duly considered Mr. Russell's report, AR 12, and Plaintiff fails to establish reversible error.

**IV.   Recommendation and notice of right to object.**

For the reasons stated, the undersigned Magistrate Judge recommends the entry of judgment affirming the final decision of the Commissioner.

The undersigned advises the parties of their right to object to this Report and Recommendation by the 13th day of October, 2015, under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). The undersigned further advises the parties that failure to make timely objection to this report and recommendation waives their right to appellate review of both factual and legal issues contained herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the Magistrate Judge in this matter.

ENTERED this 22nd day of September, 2015.

_____
SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE